
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_(signature)_

**United States Bankruptcy Judge**

**Signed August 23, 2010**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MARTIN JUNIUS GULLEY, JR., | § | CASE NO. 07-33271-SGJ-13 |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| MARTIN JUNIUS GULLEY, JR., | § | |
| AND LOREACE GULLEY, | § | |
| Plaintiffs, | § | ADV. PROC. NO. 08-03467 |
| | § | |
| V. | § | |
| | § | |
| COUNTRYWIDE HOME LOANS, INC., | § | |
| Defendant. | § | |

**MEMORANDUM OF OPINION AND ORDER: (1) VOIDING LIEN WITH RESPECT TO HOME EQUITY LOAN; (2) DISALLOWING PROOF OF CLAIM WITH RESPECT TO HOME EQUITY LOAN; BUT (3) ALLOWING EQUITABLE SUBROGATION CLAIM FOR TAXES PAID**

**I. Introduction**

Martin Junius Gulley, Jr. ("Mr. Gulley") and Loreace Gulley

("Mrs. Gulley" and, collectively with Mr. Gulley, the

1

"Plaintiffs") filed the above-referenced adversary proceeding (the "Adversary") on December 1, 2008, in order to determine the validity and extent of the lien asserted by Countrywide Home Loans, Inc. ("Countrywide") against the Plaintiffs' homestead pertaining to a home equity loan provided by Countrywide. Consolidated with the Adversary is also the Plaintiffs' Objection to Countrywide's Proof of Claim No. 7 (the "Claim Objection") (DE # 51 in Mr. Gulley's chapter 13 case). The court also previously abated any final determination on a motion for relief from stay filed by Countrywide, pending resolution of the Adversary.[1] Upon the evidence and arguments presented at the trial held on June 21, 2010 (the "Trial"),[2] the court makes the following findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014. Where appropriate, a finding of fact shall be construed as a conclusion of law and *vice versa*.

## II. Jurisdiction

The court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 1334 and 157. These are core proceedings as contemplated by 28 U.S.C. § 157(b)(2)(A), (B), and (K).

---

[1] *See* DE # 77 in Mr. Gulley's bankruptcy case.

[2] The evidence consisted of various stipulated facts, numerous documents, and two sole witnesses: Mr. Gulley and Mrs. Gulley.

### III. Findings of Fact

**A.    *The Home Equity Loan.***

The Plaintiffs, husband and wife, maintain their homestead at 3257 Kristen Drive in Dallas, Texas (the "Homestead"). The Plaintiffs purchased their Homestead in the early 1970s and eventually paid-in-entirety a 30-year purchase money mortgage thereon. Sometime after their original mortgage was paid in full, the Plaintiffs fell behind on their ad valorem property taxes on their Homestead. In order to obtain funds to pay these delinquent taxes, Mr. Gulley executed, as borrower, a Texas Home Equity Fixed/Adjustable Rate Note dated ***March 23, 2004*** in the original principal amount of $67,500, bearing interest at 10.9% (the "Note"), as well as a Texas Home Equity Security Instrument dated ***March 23, 2004*** (the "Security Agreement").[3] BNC Mortgage was the original lender and mortgagee under the Note and Security Agreement. It is stipulated that the Note admitted at the Trial contained the signature of Martin Gulley. It is also stipulated that the Security Agreement admitted at the Trial contained the signature of Martin Gulley. The Security Agreement admitted at the Trial also contained purported signatures for Loreace Gulley

---

[3] *See* Countrywide Exhibits 1 and 2. The court would also note that there was a Texas Home Equity Fixed/Adjustable Rate Rider dated March 23, 2004 (the "Rider") and a Texas Home Equity Affidavit and Agreement dated March 23, 2004 (the "Affidavit") along with several other miscellaneous documents executed in conjunction with the Note and the Security Agreement (collectively, the "Home Equity Loan Documents"). *See* Countrywide Exhibits 1-8 & 10-23.

3

and Marie Young (Mrs. Gulley's mother, who at that time lived at the Homestead and is now deceased), to purportedly consent to the creation of the lien on the Homestead.  The Security Agreement was notarized by "Theresa Siddiqui" and contained an acknowledgment as to Mrs. Gulley's signature dated *March 24, 2004*.

Mr. Gulley credibly testified at the Trial that his son, Anthony Gulley, provided him with all the necessary paperwork for the home equity loan (*i.e.*, the Home Equity Loan Documents), which Mr. Gulley signed at his auto body shop in March of 2004 with *only* Anthony Gulley present.  At the time the Home Equity Loan Documents were executed, Anthony Gulley was a licensed attorney, apparently working at American Title Company;[4] however, he has subsequently been disbarred.  Mrs. Gulley credibly testified at the Trial that in March of 2004, she was not aware that her husband, Mr. Gulley, had executed paperwork for the home equity loan, that she was not present when the Note and Security Agreement were signed by him, and that she did not know or recognize the name of the person who allegedly notarized the Note and Security Agreement (*i.e.*, Theresa Siddiqui).[5]

Countrywide's evidence at the Trial consisted of what appears to be all the necessary loan documents for a home equity

---

[4] *See, e.g.,* Countrywide Exhibit 5.

[5] Theresa Siddiqui did not appear or testify at the Trial.

4

loan.[6]  Noteworthy is that all of the loan documents and other closing documents (including the American Title Company Settlement Statement (the "Settlement Statement")) are dated *March 23, 2004*.  However, as earlier referenced, there is one significant exception: the notary acknowledgment (of Theresa Siddiqui) acknowledging the alleged signature of Mrs. Gulley on the Security Agreement (*i.e.*, confirming Mrs. Gulley's alleged consent to the granting of a first lien on the Homestead) is dated *March 24, 2004,* whereas in various other places Theresa Siddiqui's notary acknowledgment is dated March 23, 2004.[7]  The court would also point out that there are actually two places Theresa Siddiqui allegedly notarized Mrs. Gulley's signature: once on March 24, 2004 (on the Security Agreement) and once on March 23, 2004 (on a Signature Affidavit and AKA Statement.)[8]  Although, frankly, the "3" in the "March 23, 2004" on the Signature Affidavit and AKA Statement appears to have been altered by hand.

**B.  *The Settlement Statement.***

As noted above, the Settlement Statement reflects a closing/funding of a home equity loan to the Plaintiffs on March 23, 2004.  It appears that the closing of the home equity loan

---

[6] *See* Countrywide Exhibits 1-8 & 10-26.

[7] *See* Countrywide Exhibits 2, 4, 15, and 20-22.

[8] *See* Countrywide Exhibit 2 & 21.

was handled by American Title Company (as "Settlement Agent") through the Plaintiffs' son, Anthony Gulley, and with the aid of Theresa Siddiqui (as "Escrow Officer") and Sam Siddiqui (as "Closing Agent").[9]  The Settlement Statement shows the "Place of Settlement" to be at American Title Company at 350 N. St. Paul Street, Suite 1600, Dallas, Texas 75201.[10]  The Escrow Officer/Agent with authority to disburse funds is shown to be American Title Company.[11]  Additionally, Anthony Gulley's name appears on the Settlement Statement at least five times: (1) Line 1111, showing escrow fees to him of $250.00; (2) Line 1113, showing a $518.75 portion of the title insurance premiums going to him; (3) Line 1114a, showing a $60.00 messenger fee going to him; (4) Line 1115, showing a $25.00 copies/images fee going to him; and (5) Line 1115a, showing a $150.00 remote closing fee going to him.[12]  Finally, the court would note that there is a stamp on the front page of the Settlement Statement indicating that "I certify this to be a true and correct copy of the original instrument. AMERICAN TITLE COMPANY BY: [the initials

---

[9] *See* Countrywide Exhibit 5 & Exhibits 23-24.

[10] *See* Countrywide Exhibit 5.

[11] *Id.*

[12] *Id.*  Although Line 1115a makes note of a remote closing fee, paragraph M of the Texas Home Equity Affidavit and Agreement (First Lien), states that Mr. Gulley was "signing the loan documents at the office of the Lender, an attorney at law, or a title company."  *See* Countrywide Exhibit 4.

"AG" are handwritten thereafter]."[13]

The Settlement Statement indicates that, of the $67,500 total proceeds derived from the home equity loan at the closing held on *March 23, 2004*, $24,133.16 were paid directly to satisfy the liens of the taxing authorities and $14,233.00 were paid directly to satisfy debts to other creditors of the Plaintiffs, including American Express, JC Penney, Texaco, Citgo, and Shell.[14] However, the more credible evidence presented at the Trial reflected that the taxes shown on Line 105d on the Settlement Statement were *not* actually paid until October of 2004 (some seven months after the closing.)[15] Moreover, it appears that the delinquent taxes were, in fact, paid by Countrywide *directly*, and not the Plaintiffs, American Title Company, or some other third party.

The last page of the Settlement Statement purports to contain the signatures of "Martin Gulley," "Loreace Gulley," and "Marie Young." Notably, the Settlement Statement also indicates that $24,599.53 in cash was paid to "the borrower," which was defined in the Settlement Statement to be the Plaintiffs; however, the Plaintiffs credibly testified that neither of them personally received a check for these funds. Mr. Gulley did

---

[13] *See* Countrywide Exhibit 5.

[14] *Id.*

[15] *See* Countrywide Exhibit 43 and Plaintiffs Exhibit C.

7

credibly testify that he occasionally borrowed money from Anthony Gulley, but that the most money Anthony Gulley had ever given Mr. Gulley at one time was $100.00.

## C.   *Events Leading to Bankruptcy.*

After the "closing" of the home equity loan, Countrywide began sending monthly statements to the Plaintiffs pursuant to the terms of the Note.  Mrs. Gulley credibly testified that, although she did open the first Countrywide statement, she did not really understand that the statement was in regards to a home equity loan on the Homestead.  Moreover, she said that she gave that first statement, as well as all subsequent statements, to Anthony Gulley because he said "he would take care of it." However, Anthony Gulley was, apparently, not taking care of the payments on the Note, and the Note ultimately went into default.

Countrywide obtained a Home Equity Foreclosure Order on November 22, 2005.[16]  "The Plaintiffs" moved for a Temporary Restraining Order to restrain Countrywide from proceeding with foreclosure actions on December 30, 2005 (the Affidavit in support of the Plaintiffs' pleading was signed by Anthony Gulley; the pleading was filed by attorney John J. Lewis, whom the Plaintiffs credibly testified they did not retain.)[17]  On December 30, 2005, a Temporary Injunction was granted and a

---

[16] *See* Plaintiffs' Exhibit R.

[17] *See* Plaintiffs' Exhibit T.

permanent injunction hearing was set for January 13, 2006.[18]
Countrywide was ultimately successful as to all claims against
the Plaintiffs through a non-suit and resumed the foreclosure
process on or about June 22, 2006.[19]  Countrywide then filed a
second Home Equity Foreclosure Application on January 24, 2007,
but was unable to foreclose prior to Mr. Gulley filing for
bankruptcy.[20]

### D.    Mr. Gulley's Bankruptcy Case.

Mr. Gulley filed a voluntary chapter 13 case on July 6, 2007
(the "Petition Date").  On August 22, 2007, Countrywide filed
Proof of Claim No. 7 in the amount of $114,165.73 and named
Countrywide as the creditor (the "Countrywide Proof of Claim").[21]
Countrywide also filed a Motion for Relief from Stay on September
29, 2008 (DE #65 in Mr. Gulley's bankruptcy case) (the "Stay
Motion").[22]  Mr. Gulley ultimately filed the Claim Objection,
this Adversary, as well as a response opposed to the Stay Motion
(DE #71 in Mr. Gulley's bankruptcy case), each denying that

---

[18] *See* Plaintiffs' Exhibit S.

[19] *See* Plaintiffs' Exhibit D, paragraph 5.

[20] *See* Plaintiffs' Exhibit U.

[21] *See* Plaintiffs' Exhibit H.

[22] *See* Plaintiffs' Exhibits D & E.  The Stay Motion was filed by
Countrywide, as servicer for JPMorgan Chase Bank, N.A. as Trustee for
CDC Mortgage Capital Trust 2004-HE3 Mortgage Pass-Through
Certificates, Series 2004-HE3 its Assigns and/or Successors in
Interest ("JPMorgan").

Countrywide had a valid claim secured by the Homestead.[23]

## IV. Conclusions of Law

The following standing issues have been presented in connection with the Claim Objection and Adversary Proceeding: (1) whether a loan servicer is an agent for the creditor; (2) whether a loan servicer is a creditor; (3) whether a loan servicer may file a proof of claim in its own name, as a "creditor," without disclosing the identity of the owner of the note; (4) whether Countrywide's proof of claim is entitled to prima facie validity; and (5) if Countrywide's claim is not entitled to prima facie validity, whether Countrywide has failed to satisfy its burden of proof with regard to its proof of claim. Ordinarily, the court would address standing issues first. However, because both the Claim Objection and the Adversary deal with a home equity loan, which has unique and strict requirements under Texas law, and because rather remarkable defects with those requirements have been alleged here, the court believes that it is more pertinent (and perhaps more efficient) to consider the following preliminary issue: whether the manner in which the home equity loan was created and closed conforms to the requirements under Texas law, specifically Article 16, section 50, of the Texas Constitution. Only if the court first finds that the home equity loan meets the requirements of the Texas Constitution, will it

---

[23] *See* Plaintiffs' Exhibits F, G, and V.

10

need to consider the standing issues stated above.

## A. What are the Requirements Under Article 16, Section 50 of the Texas Constitution for a Home Equity Loan?

In 1997, the State of Texas, through a Constitutional Amendment to the Homestead Provision of the Texas Constitution approved by Texas voters, became the last state in the nation to allow homeowners to borrow against their home equity.[24]  The Texas Constitution was amended again in 2003, authorizing the state legislature to delegate authority to issue interpretations of the home equity lending provisions, and the legislature delegated such interpretive authority to the Finance Commission of Texas and the Credit Union Commission of Texas.[25]  The legislation reflects the State of Texas' long history of regarding the homestead as sacrosanct[26] and imposes stringent criteria in order for a lien to attach to a homestead so that foreclosure might be permissible.[27]  If the requirements are not strictly met, the lien against the homestead will not be valid.

Parsing through the most relevant portions of section

---

[24] See Tex. Const. art. XVI, § 50; *See also Lasalle Bank Nat'l Assoc. V. White*, 246 S.W.3d 616, 618 (Tex. 2007).

[25] *See* Tex. Const. art. XVI, § 50(u); Tex. Fin. Code Ann. §§ 11.308 & 15.413. (Vernon 2003).

[26] *See Cadengo v. Consol. Fund Mgmt. (In re Cadengo)*, 370 B.R. 681, 697 (Bankr. S.D. Tex. 2007).

[27] *See* Tex. Const. art. XVI, § 50(a)(6)(A)-(Q); *See also Doody v. Ameriquest Mort. Co.*, 49 S.W.3d 342, 343 (Tex. 2001); *See Box v. First State Bank*, 340 B.R. 782, 785-86 (S.D. Tex. 2006).

11

50(a)(6) of Article 16, the Texas Constitution specifically provides that, in order to foreclose on a lien created by a home equity loan, the lien must be "voluntary" and created "under a written agreement *with the consent of each owner and each owner's spouse*" and also, the loan must be "closed only at the office of the lender, an attorney at law, or a title company."[28]  While a closing must occur at one of these specified locations, Texas state court authority has indicated that it is permissible for a lender to receive an owner or owner's spouse's consent to a lien "by mail or other delivery of the party's signature to an authorized physical location and not the homestead."[29]

**B.  *Do the Home Equity Loan Documents Meet the Requirements Listed Under the Texas Constitution?***

   *1.  Mrs. Gulley's Purported Signature.*

   Here, most of the testimony at the Trial dealt with whether or not Mrs. Gulley actually signed any of the Home Equity Loan Documents, including the Security Agreement.  Specifically, Plaintiffs assert that Mrs. Gulley's signature was forged, and thus, the Home Equity Loan Documents are not effective and did not create a valid lien against the Homestead (*i.e.,* Mrs. Gulley, as an owner, did not "voluntarily" consent to a lien on the

_____

   [28] *See* Tex. Const. art. XVI, §§ 50(a)(6)(A), (a)(6)(N) (emphasis added).

   [29] Tex. Fin. Code Ann. § 153.15(3) (Vernon 2003); *See Texas Bankers Ass'n. v. Ass'n. of Cmty. Orgs. for Reform Now (ACORN)*, 303 S.W.3d 404, 416-17 (Tex. App.-Austin 2010, pet. filed).

Homestead.) Countrywide argues that the notary acknowledgment is prima facie evidence of Mrs. Gulley's signature and cannot be rebutted with mere "uncorroborated" testimony from the grantors of the lien. The decision of the Texas Court of Appeals in *1st Coppell Bank v. Smith*, 742 S.W.2d 454, 461 (Tex. App.-Dallas 1987, no writ) *disapproved on other grounds* in *Fortune Prod. Co. v. Conoco, Inc.,* 52 S.W.3d 671 (Tex. 2000), is relevant with regard to Countrywide's position here. In *1st Coppell*, the court held that, where it is found that a grantor's signature is a forgery, the court need not rule upon the effect of a forged acknowledgment.[30] Specifically, in *1st Coppell*, the court first looked to section 32.21(a)(1) of the Texas Penal Code to determine the definition of forgery.[31] Section 32.21 of the Penal Code provides that "forge" means "to alter, make, complete, execute, or authenticate any writing so that it purports . . . to be the act of another who did not authorize that act."[32] Moreover, the court indicated that a trier of fact is to consider

---

[30] *Id.* at 678.

[31] *Id.* at 460. The Texas Court of Appeals also cited to specific cases where courts applied a similar definition to the definition in the penal code in civil cases. *Id.* (citing *Smith v. Dawson*, 234 S.W. 690, 691 (Tex. Civ. App.-San Antonio 1921, no writ); *Charter Bank Nw. v. Evanston Ins. Co.*, 791 F.2d 379, 382 (5th Cir. 1986)).

[32] *See 1st Coppell*, 742 S.W.2d at 460 (citing Tex. Pen. Code § 32.21(a)(1) (Vernon 2009)).

such facts based upon a preponderance of the evidence standard.[33]

Here, Mrs. Gulley credibly testified numerous times at the Trial that she did not sign any of the Home Equity Loan Documents and did not authorize anyone to do so on her behalf. Moreover, this testimony was corroborated by Mr. Gulley's testimony that he did not believe that Mrs. Gulley signed the Security Agreement and, moreover, the signature on the Security Agreement did not appear to be hers.[34] For purposes of examining Mrs. Gulley's signature, the court had in evidence the Home Equity Loan Documents, a copy of Ms. Gulley's driver's license, and a copy of the Authorization and Acknowledgment of her Financial Statement (the "Financial Statement").[35] Upon comparing the signatures on Mrs. Gulley's driver's license and the Financial Statement with the signatures on the Home Equity Loan Documents, it would appear to the court that the signatures are not the same.[36]

---

[33] *See 1st Coppell*, 742 S.W.2d at 460 (citing *In re King's Estate v. King*, 244 S.W.2d 660, 665 (Tex. 1951)).

[34] Mr. Gulley and Mrs. Gulley have been married for 45 years, and Mr. Gulley testified that he was familiar with what Mrs. Gulley's signature looks like.

[35] *See* Plaintiffs' Exhibit X and Countrywide Exhibit 40.

[36] The court notes that there was no handwriting expert witness at the Trial. While Federal Rule of Evidence 702 certainly would have permitted the Plaintiffs to offer an expert witness on handwriting, this court could find no authority requiring an expert when a witness is testifying as to her **own** signature being a forgery. To be clear, Mrs. Gulley's signature on the Security Agreement and other Home Equity Loan Documents appeared quite different to this court's lay eyes from the other signatures produced at the Trial, including her driver's license.

14

<u>2.</u>   <u>Possibility That Mrs. Gulley's Signature Was Signed by
Anthony Gulley (or Mr. Gulley) With Her Authority</u>.

Countrywide has presented various arguments in response to
the "not my signature" evidence of Mrs. Gulley.  First,
Countrywide argues that, even if the signatures are not
authentic, the Plaintiffs authorized their son, Anthony Gulley,
to do whatever was necessary to obtain the necessary funds to
address their tax delinquencies and this ultimately overcomes any
argument from the Plaintiffs that their signatures were not
authorized.  Although this argument may overcome any suggestion
of forgery as to Mr. Gulley, particularly since he testified that
he signed at least most of the Home Equity Loan Documents, and
conceded on cross-examination that he knew his son was acting to
obtain a loan for him and was fully authorized to do it, it is
not a valid argument as to Mrs. Gulley.  Again, the court cites
to *1st Coppell*, which had very similar facts to this case.  This
case first makes clear that if "a person signs the name of
another with authority to do so, the signature is not a forgery
under civil law."[37]  However, in *1st Coppell,* the Texas Court of
Appeals found that, although the grantors may have given their
son "loose permission" to sign their names to papers generally,
unequivocal testimony from the mother indicated that she did not
grant her son authorization to sign her name to a deed of trust,

---

[37] *1st Coppell*, 742 S.W.2d at 460.

and this was sufficient evidence to support a finding that her
signature had been forged.[38]  Similarly, in the case at bar, Mrs.
Gulley unequivocally testified that she did not authorize Anthony
Gulley (nor Mr. Gulley, for that matter) to sign her name on any
of the Home Equity Loan Documents.  Thus, the court finds here
that there is sufficient evidence showing that Mrs. Gulley's
signature was also forged.

    3.   <u>Countrywide's Ratification or Estoppel Argument.</u>

    Alternatively, Countrywide has argued that Mrs. Gulley's
acceptance of the home equity loan and the benefits of the home
equity loan estops her or waives her right to challenge the
validity of the Home Equity Loan Documents, based upon the fact
that her signature was forged.  Specifically, Countrywide argues
that because she received the benefit of some of the proceeds of
the loan (allegedly to pay the delinquent taxes and perhaps other
creditors) and subsequently received mortgage statements from
Countrywide, that she was well aware of the home equity loan and
thus effectively ratified its existence and validity.  The
elements of ratification are: (1) approval by act, word, or
conduct; (2) with full knowledge of the facts of the earlier act;
and (3) with the intention of giving validity to the earlier

---

[38] *Id.*

16

act.[39]  Here, the court does not believe that the evidence shows
that Mrs. Gulley's actions rise to the level of ratification.
The evidence presented at Trial does not show that Mrs. Gulley
ever had full knowledge of the signing of the Home Equity Loan
Documents and did not even become aware that there was a lien on
the Homestead until she received the foreclosure notice from
Countrywide.  Moreover, there is Texas precedent that provides
that, in the context of creating permissible liens against a
homestead, any failure by a lender to comply with the
requirements of the Texas Constitution may not be ratified or
waived by the borrower.[40]  The bankruptcy court in *Chambers*
stated that, as a general matter, a home equity lender has the
burden to prove that a lien exists for some reason other than
estoppel.[41]  Only after that burden is discharged can there be a
basis to support a claim of waiver or estoppel.[42]  In other
words, while a homestead claimant may, under certain

---

[39] *See Gibson v. Bostick Roofing & Sheet Metal Co.*, 148 S.W.3d
482, 492 (Tex. App.-El Paso 2004, no pet.) (citing *Motel Enters., Inc.
v. Nobani*, 784 S.W.2d 545, 547-48 (Tex. App.-Houston [1st Dist.] 1990,
no writ.).  In *Gibson*, the defendant argued (and the Texas Court of
Appeals disagreed) that the Plaintiff had ratified a contract by
allowing the defendant to "take care of the matter."  *Gibson*, 148
S.W.3d at 492.

[40] *See Chambers v. First United Bank & Trust Co. (In re Chambers)*,
419 B.R. 652, 670 (Bankr. E.D. Tex. 2009) (citing Kepley *v. Zachry*,
116 S.W.2d 699, 701-02 (1938)).

[41] *Chambers*, 419 B.R at 670 (citing *Hruska v. First State Bank of
Deanville*, 747 S.W.2d 783, 785 (Tex. 1988)).

[42] *Id.*

17

circumstances, be estopped to deny the validity of an existing lien, "[a] lien cannot be 'estopped' into existence."[43]  Thus, Countrywide's ratification and estoppel arguments fail.  Not only does the court find that Mrs. Gulley did not have full knowledge of the home equity loan, but the court also concludes that a home equity lender cannot validate an otherwise invalid home equity lien through waiver or estoppel theories.

> 4.   The Significance (or Lack Thereof) of the Notary
>       Acknowledgment.

Finally, Countrywide argues that (a) even if this court were inclined to find that Mrs. Gulley's signature was forged, and (b) that her signature was not made by another for her with her authority, and (c) that the home equity loan was not later ratified by Mrs. Gulley, the notary acknowledgment contained on the Security Agreement is conclusive evidence of the recitals it contains, and thus, Mrs. Gulley's signature is **deemed** authentic. In other words, the notary acknowledgment is prima facie evidence that Mrs. Gulley signed the Security Agreement before the notary, and Mrs. Gulley cannot rebut the presumption of authenticity by mere uncorroborated testimony of a grantor under a lien.

The court agrees with Countrywide that Texas law is well settled that a certificate of acknowledgment is prima facie evidence that the grantor (here, the Plaintiffs) appeared before

---

[43] *Id.* (citing *Lincoln v. Bennett*, 156 S.W.2d 504, 505 (1941)).

the notary and executed the deed in question for the purposes and consideration therein expressed.[44] Clear and unmistakable proof that either the grantor did not appear before the notary **or** that the notary practiced some fraud or imposition upon the grantor is necessary to overcome the validity of a certificate of acknowledgment.[45] Moreover, the burden of proof is on the one who denies the genuineness of the acknowledgment and instrument, and the fact finder shall determine such issues by a preponderance of all the evidence.[46] The reason for such a stringent rule is because if it were otherwise, titles would be insecure and ruinous consequences would ensue from the doubt and uncertainty with which titles would be clouded.[47]

To be clear, Countrywide argues that because there is a notary acknowledgment on the Security Agreement, the Security Agreement is given prima facie validity, and that the Plaintiffs now have the burden to prove, by a preponderance of the evidence (and not by mere uncorroborated testimony), that either Mrs. Gulley did not appear before Theresa Siddiqui **or** that Theresa

---

[44] *See Bell v. Sharif-Munir-Davidson Dev. Corp.*, 738 S.W.2d 326, 330 (Tex. App.-Dallas 1987, writ denied) (citing *Stout v. Oliveira*, 153 S.W.2d 590, 596 (Tex. Civ. App.-El Paso 1941, writ ref'd w.o.m.).

[45] *See Bell*, 738 S.W.2d at 330 (citing *Stout*, 153 S.W.2d at 596-97) (emphasis added).

[46] *Id. See Robertson v. Vernon*, 12 S.W.2d 991, 993 (Tex. Com. App. 1929).

[47] *Stout*, 153 S.W.2d at 597.

Siddiqui practiced some fraud or imposition upon Mrs. Gulley.
Here, as mentioned earlier, we have credible testimony from Mrs.
Gulley that she never appeared before the notary and that she had
never heard of or ever met Theresa Siddiqui.[48] Mrs. Gulley also
credibly testified that, the last time she had even had anything
notarized was when she signed a document in order to avoid jury
duty while she was in nursing school in the 1990s. We also have
credible testimony of Mr. Gulley that Mrs. Gulley did not sign or
have notarized the Home Equity Loan Documents. As mentioned
earlier, the court also had handwriting samples (other
signatures) for Mrs. Gulley that differed materially from her
alleged signature on the Home Equity Loan Documents. Countrywide
did not present any additional evidence to refute Mrs. Gulley's
testimony. However, is this enough evidence to defeat the prima
facie validity of the notary acknowledgment?

The court need not ultimately decide whether this evidence
defeats the notary acknowledgment, since here, we have an
*irregularity* with respect to the notary acknowledgment that
operates to deprive it of what would otherwise be prima facie
validity and effect. More specifically, we have a notary
acknowledgment dated *March 24, 2004, one day after the closing*

---

[48] The court would note that Mr. Gulley did testify that no notary
was present when he signed the paperwork for the home equity loan,
however, since Mr. Gulley is not denying that he signed the Home
Equity Loan Documents, the court need not consider whether Mr.
Gulley's signature is a forgery.

***took place on the home equity loan***.  As stated above and as indicated on the Settlement Statement, the closing and funding on the home equity loan took place on ***March 23, 2004***.  Thus, there is no prima facie evidence that Mrs. Gulley (an owner of the Homestead) had given her voluntary consent to the creation of a lien on the Homestead as of the date of the closing of the home equity loan.  The notary purports to acknowledge that the Security Agreement was signed by Mrs. Gulley on March 24, 2004, a day after the purported creation of the lien.  This irregularity with the notary acknowledgment is critical where there is credible evidence that Mrs. Gulley did not sign the Security Agreement.  In summary, on the date of the closing, there was not a notary acknowledgment for Mrs. Gulley's purported signature on the Security Agreement that was entitled to prima facie validity.  As a result, the burden shifted to Countrywide to prove that Mrs. Gulley actually signed the Security Agreement when the Plaintiffs put on credible evidence that Mrs. Gulley never signed the Security Agreement or authorized her signature.

In summation, the court believes that Plaintiffs have shown that not only was Mrs. Gulley's signature not authentic on the Security Agreement, but also that there is no valid notary acknowledgment, ***as of the date of closing***, to create a presumption of authenticity.  Thus, there is no credible evidence that Mrs. Gulley, an owner, voluntarily consented to a lien on

her Homestead as of the date (March 23, 2004) of the alleged creation of the lien.  Countrywide's lien, thus, must ultimately fail.  Based on all of this evidence, the court finds that the Home Equity Loan Documents do not meet the first requirement under the Texas Constitution that, the extension of credit be secured by a "voluntary lien on the homestead created under a written agreement with the consent of each owner and each owner's spouse."[49]

> ### 5.  Location of Closing.

Since the Court believes that the home equity loan was not evidenced by a written agreement signed by Mrs. Gulley, the court need not consider whether the home equity loan was "closed only at the office of the lender, an attorney at law, or a title company" under article 16, section 50(a)(6)(N) of the Texas Constitution.[50]  However, having found that the Home Equity Loan Documents do not meet the requirements of the Texas Constitution, what claim, if any, does Countrywide have in Mr. Gulley's bankruptcy case?

## C.  *Countrywide's Claim in Mr. Gulley's Bankruptcy Case.*

> ### 1.  Forfeiture of All Principal and Interest.

The consequences for violating the home equity loan provisions of the Texas Constitution are harsh and unpleasant for

---

[49] *See* Tex. Const. art. XVI, § 50(a)(6)(A).

[50] *See* footnotes 28-29, supra.

a lender. Section 50(a)(6)(Q)(xi) provides that:

> the lender or any holder of the note for the extension of credit shall forfeit all principal and interest of the extension of credit . . . if the lien was not created under a written agreement with the consent of each owner and each owner's spouse, unless each owner and each owner's spouse who did not initially consent subsequently consents;[51]

Here, there is no evidence that Mrs. Gulley ever consented to the home equity loan and a placing of a lien on the Homestead.[52] Accordingly, Countrywide must now forfeit all principal and interest due to them under the Home Equity Loan Documents. Moreover, there is case law that provides that this forfeiture includes the disgorgement of all payments made by the borrower since the closing of the home equity loan.[53] However, Plaintiffs admitted that they never made a payment to Countrywide for the home equity loan, and accordingly, disgorgement is not necessary here.[54] Thus, the court partially sustains the Claim Objection and finds that the Countrywide Claim is disallowed to the extent it seeks payment of principal and interest under the Home Equity Loan Documents.

---

[51] *See* Tex. Const. art. XVI, § 50(a)(6)(Q)(xi).

[52] Countrywide never argued or put on any evidence suggesting that Mrs. Gulley might have subsequently consented to the home equity lien on March 24, 2004 **after** the closing.

[53] *See Cadengo*, 370 B.R. at 698-99 (Bankr. S.D. Tex. 2007).

[54] *See* Plaintiff's Complaint, paragraph 11 (DE # 1 in the Adversary).

23

It is worth mentioning, although it was not argued by the Plaintiffs or Countrywide at the Trial, that the Texas Supreme Court in *Doody*, ruled that certain cure provisions listed in article 16, section 50(a)(6)(Q)(x) of the Texas Constitution apply to "all the lender's obligations under the extension of credit."[55]  Section 50(a)(6)(Q)(x) provides that:

> the lender or any holder of the note for the extension of credit shall forfeit all principal and interest of the extension of credit if the lender or holder fails to comply with the lender's obligations under the extension of credit **and fails to correct the failure to comply not later than the 60th day after the date the lender or holder is notified by the borrower of the lender's failure to comply** by [there is a laundry list of ways a lender might cure noncompliance]. . .[56]

Thus, technically Countrywide had an opportunity to cure the problems with the Plaintiffs' alleged home equity loan for 60 days after being notified of the Plaintiffs' position as to the noncompliance.  As a practical matter, the 60-day notice and opportunity to cure here seems to be more form over substance, since one can envision no scenario where Countrywide might have cured its noncompliance (failure to obtain a voluntary lien) in a way that the statute might contemplate.  In any event, the 60-day opportunity-to-cure period would have began to run when the

---

[55] *See Doody*, 49 S.W.3d at 345, 347.

[56] *See* Tex. Const. art. XVI, § 50(a)(6)(Q)(x) (emphasis added).

24

Adversary was filed on December 1, 2008.[57] Therefore, the cure provision of the Texas Constitution would no longer be applicable here. Thus, as noted above, Countrywide must now forfeit all principal and interest on the home equity loan (in addition to it not having a valid lien that can be foreclosed upon).

2. <u>Subrogation Rights as to Ad Valorem Taxes Paid by Countrywide.</u>

Although the court has found that Countrywide is not entitled to collect any principal or interest due under the Note, the Countrywide Proof of Claim contains other assessments, including late charges, fees, costs, attorneys's fees, and (most significantly) payments made by Countrywide directly to Dallas County for ad valorem property taxes.[58] As to the allowability of a claim/lien for the $26,581.21 that was paid by Countrywide

---

[57] In paragraph 22 of the complaint (DE # 1 in the Adversary), Plaintiffs alleged violations of article 16, section 50 of the Texas Constitution. *See also Cadengo*, 370 B.R. at 698 (finding the cure period began to run on the date of filing the complaint); *See Adams v. Ameriquest Mortg. Co.*, 307 B.R. 549, 558 (Bankr. N.D. Tex. 2004) (holding that under previous version of § 50(a)(6)(Q)(x), the filing of an adversary proceeding containing detailed allegations of the defects in the loan was sufficient notice).

[58] *See* Countrywide Exhibit 43 and Plaintiffs Exhibits C & H. The Countrywide Loan Transaction History Spreadsheet (Plaintiffs Exhibit C) reflects a $26,581.21 claim for the payment of ad valorem taxes, which is consistent with the amount stated in the Countrywide Proof of Claim (Plaintiffs Exhibit H.) However, the printout from the Dallas County Tax Office website (Countrywide Exhibit 43) shows that the total taxes paid by Countrywide (prior to the Petition Date) are $25,370.93 ($9,861.91 + $15,379.46 + $129.56). However, there are also amounts listed showing that there were ad valorem taxes paid (prior to the Petition Date) by an "unknown" entity in the amount of $675.52 ($296.04 + $379.48) and by BAC Home Loans Servicing, LP in the amount of $771.51 ($384.05 + $387.46).

to Dallas County in connection with ad valorem property taxes on the Homestead, the court cites to *Lasalle Bank*, which specifically addressed the issue of whether or not a lender, whose lien was invalidated by failure to abide by the home equity loan provisions of the Texas Constitution might, nonetheless, assert a lien to the extent that the lender paid off constitutionally permissible tax liens.[59]  In finding that the lender was entitled to an equitable lien based on the common law right of equitable subrogation, the Texas Supreme Court first began by stating that Texas has long recognized a lienholder's common law right to equitable subrogation, which allows a third party who discharges a lien upon the property of another to step into the original lienholder's shoes and assume the lienholder's right to the security interest against the debtor.[60]  The Texas Supreme Court went on to say that section 50(e) of the Texas Constitution contained no language that would indicate displacement of equitable common law remedies, and the Texas Supreme Court declined to engraft such a prohibition into the constitutional language.[61]  In summation, the Texas Supreme Court found that the lender's secured claim arose in equity from its prior discharge of a constitutionally permitted tax lien, and

---

[59] *See Lasalle Bank*, 246 S.W.3d at 618-20.

[60] *Id.* at 618-19.

[61] *Id.* at 619.

moreover, equitable remedies apply only when there is no remedy
at law, and the forfeiture that article 50(e) imposes does not
destroy the well-established principle of equitable
subrogation.[62]  Applying the principles of *Lasalle Bank*, the
court concludes that Countrywide would still be entitled to a
secured claim and lien to the extent it paid off any valid
existing taxing liens on the Homestead, which per the Countrywide
Proof of Claim and other evidence would be $26,581.21.

> 3.  <u>"Creditor" Status of Countrywide to Assert Secured Tax
> Claim.</u>

Having established that Countrywide does, in fact, have a
secured claim in Mr. Gulley's bankruptcy with respect to the
taxes it paid (under an equitable subrogation theory), the court
must now return to the standing issues it mentioned earlier in
this opinion, specifically: (1) whether a loan servicer is an
agent for the creditor; (2) whether a loan servicer is a
creditor; (3) whether a loan servicer may file a proof of claim
in its own name, as a "creditor," without disclosing the identity
of the owner of the note; (4) whether the Countrywide Proof of
Claim is entitled to prima facie validity; and (5) if the
Countrywide Proof of Claim is not entitled to prima facie
validity, whether Countrywide has failed to satisfy its burden of
proof with regard to its claim.  As mentioned earlier, the court

---

[62] *Id.*

realizes that these issues should usually be addressed first, because they deal with whether a creditor even has standing to file a claim and standing implicates subject matter jurisdiction; however, based on the unique facts of this case, the court thought it was more important to put the proverbial cart before the horse and determine whether Countrywide could even have a claim in Mr. Gulley's bankruptcy case (because of the home equity loan alleged defects) and, if so, then tackle, as necessary, the "standing" issue.

As to the first two issues, specifically, whether a loan servicer is an agent for a creditor or whether a loan servicer is itself a creditor, the court finds that Countrywide, as a loan servicer for JP Morgan, is to be considered a creditor with standing to file a proof of claim. As recognized by the bankruptcy court in *Litton Loan Servicing, L.L.P. v. Eads (In re Eads)*, 417 B.R. 728, 739 (Bankr. E.D. Tex. 2009), many courts have held that a mortgage servicer has standing to participate in a debtor's bankruptcy case by virtue of its pecuniary interest in collecting payments under the terms of a note.[63] Thus, there is

---

[63] *See In re Tainan*, 48 B.R. 250, 252 (Bankr. E.D. Pa. 1985) (finding that a mortgage servicer is a real party in interest for purposes of Fed. R. Civ. Pro. 17(a) in a relief from stay proceeding); *Bankers Trust (Delaware) v. 236 Beltway Inv.*, 865 F. Supp. 1186, 1191 (E.D. Va. 1994) (finding that both lender and servicer have standing to foreclose based upon reading of pooling agreement); *In re Miller*, 320 B.R. 203, 206 n.2 (Bankr. N.D. Ala. 2005) (servicer permitted to litigate motion for relief from

not a per se rule prohibiting Countrywide, as a servicer, from participating in Mr. Gulley's bankruptcy case and ultimately, filing a proof of claim. Likewise, the court does not think that Countrywide, as the servicer of the Note, would be required to prove that it was JPMorgan's agent in order to file a proof of claim.

The next three issues—whether a loan servicer may file a proof of claim in its own name, as a "creditor," without disclosing the identity of the owner of the note, whether the Countrywide Proof of Claim is entitled to prima facie validity, and, whether Countrywide has failed to satisfy its burden of proof with regard to its proof of claim if Countrywide's claim is not entitled to prima facie validity—ultimately relate to Countrywide's holder status as well as chain of title issues. Specifically, Plaintiffs argue that Countrywide did not properly establish how it became the holder of the Note (or moreover, if it is a mere servicer, how JPMorgan acquired the Note and how Countrywide became the servicer) and thus, would not have standing to file a proof of claim in Mr. Gulley's bankruptcy case. It is also worth noting that these issues are addressed in the context of a claim objection, so the court must also consider

---

stay); *Greer v. O'Dell*, 305 F.3d 1297, 1302 (11th Cir. 2002) (finding that "a servicer is a party in interest in proceedings involving loans which it services").

who has the relative burden at Trial in proving these standing issues.

Judges Rhoades has provided some helpful analysis of some of these same burden shifting issues in the context of a claim objection.[64] This court agrees with her analysis that: (a) a claimant who has complied with Bankruptcy Rule 3001 and Official Form B-10 may rest on its proof of claim (it having an independent evidentiary effect such as a verified complaint) and refrain from presenting any additional evidence at the hearing on an objection; (b) the claimant will prevail unless the objecting party produces evidence of equal or greater probative force to that of the proof of claim to refute some aspect of the proof of claim; and (c) if the objector does come forward with such probative evidence, then whichever party has the burden of proof respecting assertion of the claim outside of bankruptcy, bears the burden in the contested matter from that point forward.[65]

The court would once again note that this case is unusual, and although normally Countrywide would be required to establish its holder status and the requisite chain of title of the Note (as well as attaching the required documentation for such claim), the nature of Countrywide's limited claim here does not require

---

[64] See *In re Leverett*, 378 B.R. 793, 798-99 (Bankr. E. D. Tex. 2007).

[65] *Id.* at 799.

the court to engage in such an analysis. To begin, the court
would reference section 101(5) of the Bankruptcy Code, which
provides that the term "claim" means "a right to payment, whether
or not such right is reduced to judgment, liquidated,
unliquidated, fixed, contingent, matured, unmatured, disputed,
undisputed, legal, **_equitable_**, secured, or unsecured."[66] Here,
Countrywide's limited right to payment is based upon an equitable
subrogation claim for the payment of the Plaintiffs' ad valorem
property taxes and not due to the fact that Countrywide is the
holder/servicer of the Note. Again, this equitable subrogation
doctrine allows a third party (_i.e.,_ Countrywide) who discharges
a constitutionally-permissible lien upon the property of another
to step into the original lienholder's shoes and assume the
lienholder's right to the security interest against the debtor
(_i.e.,_ the Plaintiffs).[67] Moreover, since this is an equitable
claim, rather than a claim based upon a written agreement between
the Plaintiffs and Countrywide/JPMorgan, Bankruptcy Rule 3001(c)
would also not apply.[68] Here, we have credible evidence that
Countrywide paid the Plaintiffs' ad valorem property taxes and

---

[66] 11 U.S.C. § 101(5)(A) (2010) (emphasis added).

[67] _See Lasalle Bank_, 246 S.W.3d at 619.

[68] Bankruptcy Rule 3001(c) states that "when a claim, or interest
in property of the debtor securing the claim is based in writing, the
original or duplicate shall be filed with the proof of claim." Fed.
R. Bankr. Proc. 3001(c).

such payments were specifically referenced in the Countrywide Proof of Claim.[69]  Moreover, the Countrywide Proof of Claim complied with Official Form B-10.  Thus, the Countrywide Proof of Claim has prima facie validity as to the equitable subrogation claim, and Plaintiffs ultimately had the burden at Trial to refute the validity of such claim.  Plaintiffs did not present any evidence that they, in fact, paid the taxes, or that some other third party besides Countrywide paid the taxes.  However, even if the Countrywide Proof of Claim did not have prima facie validity, the court believes that there was sufficient evidence presented at the Trial, specifically, a Countrywide Loan Transaction Spreadsheet as well as a Payment Information printout from the Dallas County Tax Office website, indicating that Countrywide (and not some other party) paid the Plaintiffs' ad valorem property taxes in October of 2004.[70]

Since Countrywide has presented evidence showing a "right to payment" under section 101 of the Bankruptcy Code for the payment of the Plaintiffs' ad valorem property taxes and has properly

---

[69] See Plaintiffs' Exhibit H.

[70] *See* Plaintiffs' Exhibit C and Countrywide Exhibit 43. Moreover, as noted in footnote 58, although the amounts listed in the Countrywide Loan Transaction History Spreadsheet (Plaintiffs' Exhibit C) and the printout from the Dallas County Tax Office website (Countrywide Exhibit 43) were slightly different, the court finds that the amount reflected in the Countrywide Proof of Claim for the payment of ad valorem property taxes ($26,581.21), which is consistent with Plaintiffs' Exhibit C, would be entitled to prima facie validity since such amount was not disputed by the Plaintiffs at the Trial.

evidenced such right in the Countrywide Proof of Claim as well as through the evidence submitted at Trial, the court need not analyze whether or not Countrywide is the servicer for JPMorgan and whether or not Countrywide/JPMorgan is the holder of the Note.[71]

Having found that Countrywide has a $26,581.21 secured claim with respect to taxes it paid for the benefit of the Plaintiffs and that Countrywide has no "standing" problem, the court must now determine whether Countrywide is entitled to any late charges, fees, costs, and attorney's fees that were reflected in the Countrywide Proof of Claim.

To determine this, the court turns to section 506(b) of the Bankruptcy Code, which allows an oversecured creditor (here there can be no dispute that Countrywide is oversecured with respect to its $26,581.21 tax subrogation claim, since the Homestead is valued at $102,880 per Mr. Gulley's schedules) to recover "any reasonable fees, costs, or charges provided for under the loan documents or state statute under which such claim arose."[72] Here, because the claim and lien on the Homestead pursuant to the Home Equity Loan Documents has been disallowed and voided,

---

[71] However, even if it were a relevant issue, the court believes that there is some evidence showing that Countrywide was servicing the Note for JPMorgan, mainly: (1) the Stay Motion (Plaintiffs' Exhibit D); and (2) a Notice of Acceleration Dated July 20, 2005 (Countrywide Exhibit 34).

[72] *See* 11 U.S.C. § 506(b) (2010).

Countrywide would, of course, not be able to recover any additional fees or costs (including attorney's fees) under the Home Equity Loan Documents. But there are certainly state statutes that would permit ad valorem taxing authorities to certain charges and fees, and these may be available to Countrywide as part of its equitable subrogation tax claim. Countrywide has not argued which state statutes might entitle it to charges and fees associated with the equitable subrogation tax claim. Nor has Countrywide presented any evidence of what fees and charges it has incurred in regards to the equitable subrogation tax claim versus what fees and charges it has incurred in regards to the claim for principal and interest that has now been disallowed. Thus, this court is not in the position to allow Countrywide any section 506(b) claim for fees, costs, and charges at this time.

### V. Conclusion

This has been an unusual and troubling Adversary. The preponderance of the credible evidence leads this court to inescapably conclude that the Plaintiffs' son, Anthony Gulley, defrauded them and also defrauded Countrywide (although fraud, *per se*, is not before the court). As noted herein, Anthony Gulley was a lawyer at the time of the events that are the subject of this Adversary, and he was subsequently disbarred (why he was disbarred is not in evidence). Anthony Gulley's parents

34

apparently trusted him and he breached that trust.  Mr. Gulley
(the father and one of the Plaintiffs) acknowledges that he was,
indeed, aware that he was signing loan papers (that day at Mr.
Gulley's automotive body shop) that would enable his son to
arrange a loan to pay off the Plaintiffs' ad valorem taxes on
their Homestead.  But it is clear that Mr. Gulley did not
anticipate that Anthony Gulley would "mortgage up" the
Plaintiffs' Homestead with a $67,500 home equity loan (far more
than was necessary to pay the ad valorem taxes), and then not
only fail to pay the ad valorem taxes, but also take the money
for Anthony's own benefit.

There was no evidence to refute the Plaintiffs' testimony
that they never received any loan proceeds.  And there was no
evidence to refute Mrs. Gulley's very credible testimony that:
(i) she never was aware that a loan was being taken out on her
house, (ii) the signature on the Home Equity Loan Documents was
not hers (to be clear, the signature did not even remotely
resemble her ordinary signature as shown on her driver's
license), and (iii) she had not authorized anyone to sign the
Home Equity Loan Documents for her.  All that Mrs. Gulley was
aware of was that Anthony Gulley was supposed to be helping the
Plaintiffs with their ad valorem taxes.  Now Mr. Gulley is in
bankruptcy with a $114,165.73 secured claim being asserted by
Countrywide.  This, after paying in full (in or around year 2000)

35

the 30-year original purchase mortgage the Plaintiffs obtained in or around 1970 on their Homestead.

As earlier mentioned, the result here for Countrywide is harsh. The court believes Countrywide (or its predecessor) was duped just as the Plaintiffs were. Anthony Gulley's position as a lawyer at a title company gave him a wide amount of latitude to "get away" with the type of scheme he orchestrated in the case at bar. But the Texas Constitution's provisions regarding home equity loans are designed to protect Texas consumers from this very type of thing (*i.e.*, people such as the Plaintiffs being deprived of their equity in their fully-paid off home, unless very strict requirements are met, one such requirement being that all owners of the homestead voluntarily consent to the creation of a lien). Here, Mrs. Gulley did not deliver to (or go into) the office of a title company, lender, or attorney and consent to a lien. Here, Mrs. Gulley did not give Anthony or Mr. Gulley permission to sign on her behalf. Here, Anthony Gulley did all the consenting **for** his mother (with his apparent cohorts, the Siddiques). Anthony (or perhaps Anthony and the Siddiques) prepared the paperwork and "took the money and ran."[73] Now

---

[73] This court cannot help but wonder: (a) why wasn't Anthony Gulley called or subpoenaed to testify at Trial; (b) why weren't the Siddiques called or subpoenaed to testify at Trial; and (c) why wasn't a lender-representative called and subpoenaed to testify at Trial? As for Anthony, the court can only speculate that the Plaintiffs made a "Hobson's choice" and decided not to put their son in the position of incriminating himself. As for the Siddiques, the court can only

Countrywide pays the price. It is no doubt not the first time that lax mortgage loan practices have caused Countrywide, and the American taxpayer, a loss. Countrywide can sue Anthony Gulley (and the Siddiques) if it chooses to pursue a remedy for the apparent fraud. And this court can make a criminal referral to the United States Attorney regarding their conduct—and most certainly will. But, as for this Adversary, based on all the foregoing, the court rules as follows:

1. Countrywide's alleged home equity loan on the Homestead is invalid because of failure by the lender to obtain the consent of one of the owners (Mrs. Gulley) to the creation of a voluntary lien thereon. Thus, the lien on the Homestead in respect of the home equity loan is void and may not be foreclosed upon.

2. Countrywide, pursuant to the terms of the Texas Constitution, is declared to have forfeited all principal and interest associated with the home equity loan.[74]

3. Countrywide has standing to assert, and is hereby allowed in this case, a claim of $26,581.21 secured by a lien on

---

speculate that perhaps the Plaintiffs might have feared that the Siddiques could incriminate their son (or, perhaps, both the Plaintiffs and Countrywide simply thought the Siddiques would be useless and memory-less as witnesses). As for a lender-representative, the court can only speculate that Countrywide has no witness anywhere who knows anything about the facts and circumstances surrounding the closing of this loan. Welcome to the world of home mortgage lending in the go-go 1990's and early 2000's. This is but one more story explaining the current Great Recession.

[74] Tex. Const. art. XVI, § 50(a)(6)(Q)(xi).

the Homestead. Such claim is allowed pursuant to common law equitable subrogation theories recognized in the State of Texas, and by virtue of the fact that Countrywide paid this amount of ad valorem taxes on the Homestead.

4. The court reserves jurisdiction and power to consider whether Countrywide should be allowed reasonable attorney's fees, costs or charges provided for under state statute (and pursuant to Section 506(b)) associated solely with the $26,581.21 tax claim it is being allowed. Countrywide may request a subsequent hearing on same.

5. The court reserves the jurisdiction and power to consider whether the Plaintiffs' attorney should be awarded attorney's fees associated with bringing the Adversary and Claim Objection. Plaintiffs' attorney may request a subsequent hearing on same.

**IT IS SO ORDERED.**

**\* \* \* END OF MEMORANDUM OPINION AND ORDER \* \* \***